UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

---

Mark Pasternak,
      Plaintiff,

                **Hon. Hugh B. Scott**

                 **Decision**
    vs              **&**
                 **Order**
                 00CV369
                 Consent

Tommy E. Baines, individually
and in his official capacity,
      Defendant

---

  Before the Court is the defendant's motions for Judgement as a matter of law and/or a new trial (Docket No. 100) and the plaintiff's motion for attorney fees (Docket No. 101).

**Background**

  The plaintiff, Mark Pasternak ("Pasternak"), brought this employment discrimination action pursuant to Title 42 U.S.C. §§ 1981, 1983 and the New York State Human Rights Law (N.Y. Exec. Law § 296, et. Seq.). Pasternak, who is Caucasian, was employed by the New York State Office of Child and Family Services ("NYSOCFS") at the Evening Reporting Center ("ERC") as a youth division aide ("YDA"). For much of the time relevant in this case, Pasternak was also responsible for coordinating compliance with American Correctional Accreditation ("ACA") standards. The defendant, Tommy E. Baines ("Baines"), was Pasternak's supervisor at

the ERC beginning in 1995. Pasternak alleged that Baines, who is African American, harassed him based upon his race repeatedly and continually over a three year period. He claimed that he suffered from depression, among other things, due to the alleged harassment by Baines. After a jury trial, commencing on August 6, 2007 and concluding with a verdict on August 21, 2007, the jury found in favor of the plaintiff and awarded Pasternak $150,000 in compensatory damages. (Docket No. 98).

Baines now moves to set aside the verdict and for a judgment as a matter of law under Rule 50(b) of the Federal Rules of Civil Procedure (F.R.C.P.) based upon the plaintiff's failure to establish a prima facie case. In addition, the defendant also seeks a new trial under F.R.C.P. Rule 59 based upon the argument that the verdict is contrary to the weight of the evidence and that damages are excessive. (Docket No. 100). The plaintiff moves for attorney's fees under F.R.C.P. 54 and 42 U.S.C. §1981 and 1988. (Docket No. 101).

**Discussion**

**Rule 50(b) Motion for Judgement as a Matter of Law**

In ruling on a motion under Rule 50(b), the court is required to consider the evidence in the light most favorable to the party against whom the motion was made and to give that party the benefit of all reasonable inferences that the jury might have drawn in his favor from the evidence. Concerned Area Residents for Environment v. Southview Farm, 34 F.3d 114, 120 (2d. Cir. 1994); Smith v. Lightning Bolt Productions, Inc., 861 F.2d 363, 367 (2d Cir.1988). To grant a judgment as a matter of law, the court must find that there is "'such a complete absence of evidence supporting the verdict that the jury's findings could only have been the result of sheer

surmise and conjecture, or ... such an overwhelming amount of evidence in favor of the movant that reasonable and fair minded men could not arrive at a verdict against [it].'" Song v. Ives Lab., Inc., 957 F.2d 1041, 1046 (2d Cir.1992) (quoting Mattivi v. South African Marine Corp., 618 F.2d 163, 168 (2d Cir.1980)).  The court "'cannot assess the weight of conflicting evidence, pass on the credibility of the witnesses, or substitute its judgment for that of the jury.'" Lightning Bolt Prods., 861 F.2d at 367 (quoting Katara v. D.E. Jones Commodities, Inc., 835 F.2d 966, 970 (2d Cir.1987) (quoting Mattivi, 618 F.2d at 167)).

Baines asserts that the evidence introduced at trial does not support a rational finding that any discriminatory conduct against the plaintiff was sufficiently pervasive, as a matter of law, to establish a *prima facie* hostile work environment claim.  At trial, Pasternak testified that he began full-time work for the New York State Division for Youth ("DFY") in 1979[1] and that it was not until 1995[2], when he came under the supervision of Baines, that he experienced any racially hostile incidents. (Docket No. 116 at 26, 34).  The plaintiff testified that Baines made derogatory remarks in his presence about an auditor, calling him a "redneck from Kentucky."

---

[1] Pasternak was the subject of a PINS petition as a youth and was placed with DFY at the age of 13.  He lived in a DFY group home until he graduated from high school. He obtained part-time employment with DFY shortly after graduating from high school (Docket No. 116 at 20-25).

[2] Pasternak testified that he had two "run-ins" with Baines prior to Baines becoming director of the ERC.  On one occasion, Baines ordered Pasternak to remove his hat while indoors; Pasternak stated he refused to do so because other employees had allegedly not been ordered to remove their hats.  Pasternak filed a complaint, which he withdrew once Baines became ERC director (Docket No. 32-33).  The second incident involved an instance when Baines asked Pasternak to go to another DFY facility that was experiencing an "uprising"; but Pasternak stated he could not because he was experiencing severe abdominal pains.  According to the plaintiff, Baines called him a "pussy" and said that he just did not want to handle the uprising.  Pasternak testified that his appendix ruptured that same night. (Docket No. 116 at page 33-34).

(Docket No. 116 at 35). Pasternak stated that he spoke immediately with Baines about making such remarks, but that Baines just "walked away." (Docket No. 116 at 35). Pasternak testified that Baines called him a "white boy" (Docket No. 116 at 39). On another occasion, Pasternak was ordered by Baines to leave a training session in Rochester. When asked why he had to leave, Baines stated to Pasternak: "You're not a brother, handle it." (Docket No. 116 at 42). On another occasion, Baines directly referred to Pasternak as being a "stupid pollock" (Docket No. 116 at 44). Pasternak claimed that Baines continued his racial hostilities against him by requiring him to copy the same facility operations manual for him on three separate occasions in a short time period. (Docket No. 116 at 48-49). The plaintiff testified that, at that time, Baines made a comment to the staff that: "all you brothers are doing the work up here and that white boy [referring to Pasternak] is doing nothing down there." (Docket No. 116 at 50). Pasternak stated that at one point, Baines' superior at DFY directed that Baines and Pasternak meet to "work out" their differences (Docket No. 116 at 52). At that meeting, Pasternak stated that the discussion included the fact that Pasternak's son made the paper as a high school athlete, at which point Baines mentioned that when he was in high school he had "some big old smart white boy blocking for him." (Docket No. 116 at 53). Pasternak testified that he told Baines that he could not believe Baines would continue to talk in that manner when they were meeting to "rectify the situation" based on similar comments. The plaintiff asserted that Baines responded: "I talk this way, that's the way I am. That's the way I was brought up, handle it." (Docket No. 116 at 53). Pasternak testified that on another occasion Baines left a psychiatric evaluation document relating to Pasternak in the dining room of the facility where it could be viewed by others. (Docket No. 117 at 65). Further, the plaintiff stated that Baines changed his working hours to

4

make it difficult for him to fulfill his role as ACA coordinator.  Pasternak asserted that Baines changed the locks on an office door preventing him from gaining access to information necessary to perform certain aspects of his ACA job function.  When asked why the changes were made, Pasternak testified that Baines told him: "you're a white boy and I don't like white boys, handle it."  (Docket No. 117 at 68-70).

Pasternak testified that he filed numerous complaints regarding Baines conduct, including a complaint with the New York State Inspector General's Unit ("SIU").  (Docket No. 117 at 71). Pasternak stated that he overheard a conversation between Baines and James Smith in which Baines stated that he wanted to "get the rats out of the facility," referring to those who spoke out against him, "especially the big old white boy." (Docket No. 117 at 73).  The plaintiff also submitted evidence that Baines referred to Pasternak as "Paste*rat* " both on a phone answering machine and in writing. (Docket No. 117 at 74- 76).  The plaintiff testified that on several occasions, Baines directed Pasternak to perform out-of-title menial tasks, such as to go outside an shovel the sidewalk, when he was supposed to be working on his job duties.  (Docket No. 117 at 87, 89-).  Pasternak also testified that Baines required Pasternak to drive during a driving ban (Docket No. 117 at 89); that Baines interfered with Pasternak's ability to use a state vehicle to attend a training session in Rochester, New York (Docket No. 117 at 93); that Baines scheduled Pasternak to attend suicide prevention training but failed to advise Pasternak that he was required to attend the sessions (Docket No. 117 at 99); that Baines changed Pasternak's work schedule to give him irregular hours (Docket No. 117 at 103); and that Baines scheduled Pasternak (who also served the DFY as a regional fire safety inspector) to inspect the DFY facility at Oatka, New York without telling him in advance of the inspection (Docket No. 117 at 108-10).   Pasternak

also asserted Baines required Pasternak to come in to be interrogated regarding missing computer equipment even though the equipment became missing at a time while Pasternak was out on sick leave, and that Baines "barged in" the room while Pasternak was being interrogated and smirked at him while he was being questioned. (Docket No. 117 at 120-122). He stated that Baines filed meritless disciplinary charges against him. (Docket No. 117 at 137-139).

The plaintiff asserted that in 1997 he began receiving psychiatric treatment due to mood swings and depression suffered as a result of the hostile treatment by Baines. (Docket No. 117 at 112-116). Dr. Oscar Lopez testified that he began treating Pasternak on March 7, 1997 and that the treatment continues through the time of the trial. (Docket No. 119 at 339). He testified that at that time he diagnosed Pasternak as suffering from anxiety and depression. (Docket No. 119 at 375). At the time of the trial, Dr. Lopez testified that he now considers Pasternak to have been suffering from post-traumatic stress disorder. (Docket No. 119 at 376). He opined that Pasternak's condition was causally related to the workplace incidents attributable to the manner in which he was treated by Baines. (Docket No. 119 at 390).[3] Jacqueline Gray, a former DFY employee, testified for the plaintiff. (Docket No. 124 at 1148). Gray, who is African American, testified that she worked with Baines and Pasternak at the ERC. (Docket No. 124 at 1150). She testified that Baines would talk to her about Pasternak, and that in those conversations he would refer to Pasternak with racially derogatory terms such as "white honky" and "white cracker."

---

[3] Upon cross-examination, the defendant challenged Dr. Lopez's testimony by, inter alia, establishing that Dr. Lopez's diagnosis was almost exclusively upon Pasternak's complaints to him (Docket No. 119 at 402-403); and that the Diagnostic and Statistical Manual of Mental Disorders IV ("DSM") manual describes PTSD as a disorder arising from the exposure to a traumatic event, not the type of harassment Pasternak complained of in this case. (Docket No. 119 at 444-446). Dr. Lopez testified that the updated version of the DSM, DSM V, will include an expanded description of PTSD. (Docket No. 119 at 447).

(Docket No. 124 at 1152). Gray testified that Baines expressed hatred towards Pasternak. (Docket No. 124 at 1152). According to Gray, Baines did not use negative names to refer to other staff members. (Docket No. 124 at 1161).[4]

Seabron Johnson testified for the defendant. (Docket No. 121 at 646). Johnson worked for DFY for 31 years and that he worked with both Baines and Pasternak. (Docket No. 121 at 647; 653; 660). Johnson testified about his observance of the relationship between Baines and Pasternak, how Pasternak's hours were set and the allocation of Pasternak's youth aide and ACA responsibilities. He stated that he did not observe Baines singled any individual out for criticism and that he never heard Baines make any racial remarks towards Pasternak. (Docket No. 121 at 688).

The defendant also called Charles Alaimo as a witness. (Docket No. 122 at 820). Alaimo also worked at the DFY and had worked with both Baines and Pasternak. (Docket No. 122 at 823-25). Alaimo started with the DFY in 1965 and worked with Pasternak when the plaintiff was placed there as a youth. (Docket No. 121 at 869; 876-978). Alaimo testified that he had disagreements with Pasternak regarding Baines. Pasternak sent a memo to Alaimo stating that Baines had made negative statements to others about Alaimo. (Docket No. 122 at 857-60). Alaimo stated that Pasternak made "very derogatory" remarks about "the leadership" of the ERC facility (Docket No. 122 at 863). Alaimo did not agree with Pasternak's characterization of events, and in the ensuing exchange between the plaintiff and Alaimo, Pasternak made derogatory remarks toward Alaimo. (Docket No. 122 at 868-869). Alaimo characterized

---

[4] This testimony was contrary to a written statement signed by Gray, which asserts that Baines did call other people names. (Docket No. 124 at 1165).

Pasternak's comments as "blind, vicious and unwarranted attacks." (Docket No. 122 at 871). Alaimo testified that he never heard Baines "remark or comment about Pasternak in a racially inappropriate or antagonistic fashion." (Docket No. 122 at 873).

    Baines testified that the ERC came under his supervision in 1995 (Docket No. 123 at 992). Baines recalled that, prior to becoming supervisor of Pasternak at the ERC, he presided over a meeting at which he did ask Pasternak to remove his hat, and that Pasternak refused to do so. Baines stated that the only other DFY employee with a hat on was a female employee, and that he did not ask her to remove her hat because "for females" he considered it part of their "garment." (Docket No. 123 at 999-1000). Baines testified that his request for Pasternak to remove his hat had nothing to do with the plaintiff's racial background. (Docket No. 123 at 1002). Baines stated that as ACA coordinator, Pasternak was responsible for collecting data from various departments and putting that information into pre-established files. According to Baines, the person "serving in the capacity of an ACA coordinator has volunteered for" the role and that it did "not change his tasks and responsibilities as a youth division aide." (Docket No. 123 at 1005). Baines stated that he changed Pasternak's hours as part of a change in the program at the direction of his superiors. (Docket No. 123 at 1013). He testified that after Pasternak resigned from his ACA duties, Baines removed Pasternak's access to the computer system maintained for that purpose. (Docket No. 123 at 1017). Baines acknowledged that another DFY employee, James Smith, who is also African American, filed an affirmative action complaint against Baines. (Docket No. 123 at 1010). He testified that another African American DFY employee, Dwight Hicks, also objected to performing menial tasks, such as raking the lawn, when ordered to do so by Baines. (Docket No. 123 at 1030). Baines testified that Smith, Hicks,

and Antonio Melendez all sued him based upon alleged human rights violations, and that the lawsuits were dismissed. (Docket No. 123 at 1068). Baines also testified that he was aware that other DFY employees had complained that Baines had referred to Pasternak as "white boy" and "white cracker motherfucker" in their presence. (Docket No. 124 at 1101). He denied referring to Pasternak as "Paste*rat*" (Docket No. 124 at 1112).

Construing all of the evidence in the light most favorable to the plaintiff and giving the benefit of all reasonable inferences that the jury might have drawn in his favor, the record supports the jury's determination in this matter. The evidence, particularly the testimony of Pasternak and Gray, provide a basis for the jury to have concluded that Baines repeatedly made racially charged comments to the plaintiff and/or referred to the plaintiff in racially derogatory terms. In addition, in light of the evidence of explicit racial remarks made by Baines, Pasternak presented evidence which he claimed demonstrated that Baines took other negative actions against him (i.e. changes in his work hours; changes in how his ACA responsibilities were to be performed; interference with his ability to attend a training session in Rochester; the assignment of menial tasks; the disclosure of documents relating to the plaintiff's mental health evaluation) which contributed to the hostile environment Baines created based upon the plaintiff's race. Alfano v. Costello, 294 F.3d 365, 378 (2d Cir.2002)("Facially neutral incidents may be included in the 'totality of the circumstances' that courts consider in any hostile work environment claim, so long as a reasonable fact-finder could conclude that they were, in fact, based on" the protected characteristic at issue, in this instance-age.); Howley v. Town of Stratford, 217 F.3d 141, 155-56 (2d Cir.2000) (concluding that a reasonable fact-finder could infer that facially sex-neutral incidents were based on sex-animus where the perpetrator had made prior sexually derogatory

comments). The jury was entitled to consider the evidence of various race-neutral incidents in support of the plaintiff's discrimination claim notwithstanding the fact that the defendant offered evidence that these incidents were not racially motivated. In viewing the totality of the circumstances, the jury was not required to accept the defendant's contention that innocent race-neutral explanations existed with respect to these issues. Instead, the jury was free to infer that these facially race-neutral incidents were part of the hostile environment created by Baines based upon a racial animus.

Baines motion for a judgement as a matter of law pursuant to Rule 50(b) is denied.

**Rule 59(a) Motion for a New Trial**

The defendant also seeks a new trial under Rule 59(a) of the Federal Rules of Civil Procedure. The Court has significant discretion in determining a motion for a new trial under Rule 59. See. e.g., Bseirani v. Mahshie, 881 F.Supp. 778, 783 (N.D.N.Y.1995), aff'd, 107 F.3d 2 (2d Cir.1997). A new trial may be granted if "the court is convinced that the jury has reached a seriously erroneous result, or that the verdict is against the weight of the evidence, making its enforcement a miscarriage of justice." Smith v. Lightning Bolt Productions, Inc., 861 F.2d 363, 370 (2d Cir.1988); Taylor v. National Railroad Passenger Corporation, 868 F.Supp. 479, 484 (E.D.N.Y. 1994). The court may weigh the evidence for itself without viewing it in the light most favorable to the nonmoving party, and may set aside the verdict even though there is substantial evidence to support it. Song v. Ives Laboratories, Inc., 957 F.2d 1041, 1047 (2d Cir.1992); In re Asbestos Litigation, 986 F.Supp. 761, 765 (S.D.N.Y. 1997).

However, the grant of a new trial is warranted only where the court "'is convinced that

the jury has reached a seriously erroneous result or that the verdict is a miscarriage of justice.'" Sorlucco v. New York City Police Dep't, 971 F.2d 864, 875 (2d Cir.1992) (quoting Smith v. Lightning Bolt Produc., Inc., 861 F.2d 363, 370 (2d Cir.1988)).

In the instant case, the Court cannot conclude that the jury's verdict was against the weight of the evidence or that it constituted a miscarriage of justice.  Substantial evidence in the record supports a finding that Baines made racially charged comments to Pasternak and otherwise referred to Pasternak in racially derogatory terms.  Based upon the testimony of Pasternak and Gray, it could be concluded that these incidents occurred in sufficient number, along with the facially race-neutral incidents, as to be pervasive, and thus, supportive of a finding that Baines violated the plaintiff's rights as claimed.  Further, the Court cannot conclude that the jury award of $150,000 is excessive so as "to shock the judicial conscience and constitute a denial of justice." Ismail v. Cohen, 899 F.2d. 183, 186 (2d Cir. 1990).  The motion for a new trial pursuant to Rule 59 is denied.

**Plaintiff's Motion for Fees**

Pursuant to 42 U.S.C. §§1981 and 1988, the plaintiff seeks attorneys fees ($149,529.00) and disbursement ($10,213.52) totaling $159,742.52. (Docket No. 101).

The Civil Rights Attorney's Fees Awards Act of 1976, 42 U.S.C. § 1988, provides that "[i]n any action or proceeding to enforce a provision of section[ ] 1981 ... of this title ... the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee ...." 42 U.S.C. § 1988(b).  The defendant does not contest that the plaintiff is a prevailing party as defined under §1988.

The purpose of Section 1988 is to "ensure effective access to the judicial process for persons with civil rights grievances." The movant seeking reimbursement bears the burden of proving the hours spent and the prevailing rates. 7 *Moore's Federal Practice-Civil* § 37.23[8] (2005). District courts are generally "given broad discretion in assessing what is reasonable under the circumstances." Lucian v. Olsten Corp., 109 F.3d 111, 115 (2d Cir.1997). In Arbor Hill Concerned Citizens Neighborhood Ass'n v. County of Albany and Albany County Bd. of Elections, --- F.3d ----, 2008 WL 961313 (2d Cir. April 10, 2008), the Second Circuit discussed the process to be used by District Court's in determining an application for attorneys fees:

> We think the better course-and the one most consistent with attorney's fees jurisprudence is for the district court, in exercising its considerable discretion, to bear in mind *all* of the case specific variables that we and other courts have identified as relevant to the reasonableness of attorney's fees in setting a reasonable hourly rate. The reasonable hourly rate is the rate a paying client would be willing to pay.

Arbor Hill, 2008 WL 961313 at *7. In determining what rate a paying client would be willing to pay, the Second Circuit held that the District Court may exercise their discretion by considering various factors, including those set out in Johnson v. Ga. Highway Express, Inc., 488 F.2d 714 (5th Cir.1974)[5], and "should also bear in mind that a reasonable, paying client wishes to spend the minimum necessary to litigate the case effectively. The district court should also

---

[5] The twelve Johnson factors are: (1) the time and labor required; (2) the novelty and difficulty of the questions; (3) the level of skill required to perform the legal service properly; (4) the preclusion of employment by the attorney due to acceptance of the case; (5) the attorney's customary hourly rate; (6) whether the fee is fixed or contingent; (7) the time limitations imposed by the client or the circumstances; (8) the amount involved in the case and the results obtained; (9) the experience, reputation, and ability of the attorneys; (10) the "undesirability" of the case; (11) the nature and length of the professional relationship with the client; and (12) awards in similar cases. Johnson, 488 F.2d at 717-19.

consider that such an individual might be able to negotiate with his or her attorneys, using their desire to obtain the reputational benefits that might accrue from being associated with the case. The district court should then use that reasonable hourly rate to calculate what can properly be termed the 'presumptively reasonable fee.' " Arbor Hill, 2008 WL 961313 at *7. [6]

The hourly rates proposed by plaintiff are as follows: $260 per hour for work by David Seeger, Esq; $180 per hour for work performed by Alison Odojewski, Esq.; and $85 per hour for work performed by Richard Lam at $85 per hour. The Court finds that the hourly rate sought in connection with the time of Seeger and Odojewski is somewhat high for this type of case and awards made in similar cases in this District. The instant case did not present complex legal or factual issues. Is support of the instant fee application, Seeger represented that in Real Estate Investors Asoc. v. City of Jamestown, et al., 00CV815 (W.D.N.Y. April 13, 2006), Judge Arcara had made an award of attorneys fees for himself and Odojewski at $240/hour and $160/hour, respectively. That is a misstatement. The fee application filed in that case sought $160/hour for Odojewski's time, but was reduced to $135/hr. See in Real Estate Investors Asoc. v. City of Jamestown, et al., 00CV815, Docket No. 81 at page 23 (Plaintiffs have not provided the court with any evidence to support their contention that the $160/hr rate for Odojewski is reasonable for a junior level associate in the current Buffalo market). The plaintiff has not presented the Court with evidence that the hourly rates for legal representation in civil rights cases, such as the instant matter, have risen since the entry of the award in Real Estate Investors Asoc.. The Court adjusts the hourly rate applicable to the time attributed to Seeger at $240 per hour; and the time

---

[6] In Arbor Hill, the Second Circuit abandons use of the term "lodestar" in favor of the "presumptively reasonable rate." Arbor Hill, 2008 WL 961313 at *7.

for Odojewski at $135 per hour, similar to that awarded by Judge Arcara in <u>Real Estate Investors Asoc.</u>

A review of the time entries submitted in support of the instant motion reveals some excesses. For example, entries for five days between 2/7/99 and 3/12/99 reflect that Seeger spent 25.25 hours researching the elements of §1981, §1983 and the 11th Amendment. This is excessive for an attorney with Seeger's experience in these cases. The court reduces this by 20 hours. Similarly, the entries for 11/8/06, 2/22/07, 3/7/07 and 3/8/07, reflect that Seeger spent 22.25 hours responding to the defendant's motions in limine. This amount appears excessive in light of the issues involved and is reduced by 6 hours. The entry on 9/15/02 reflects that Seeger spent 6 hours reviewing sample logbook pages and drafting a memo for Odojewski on how to review the logbook entries and meeting with Odojewski regarding the same. The Court declines to award time for such internal conferences, instruction and development of an associate counsel. Some entries provide insufficient explanation for review. Some of the time entries posted by Odojewski also appear excessive. The entry on 4/28/00, for example, records 9.25 hours to draft the complaint. This amount is facially excessive in light of the absence of complex legal or factual issues. The Court reduces this amount by 5 hours. Odojewski's time entries for "attendance at trial" are also excessive. With one noted exception, Odojewski did not sit at counsel's table when present in the courtroom, but instead sat in the gallery. She did not examine any witnesses, nor proffer arguments on legal issues. The one noted exception was that for a few hours during jury deliberation, she sat in for Seeger. Odojewski records 40.25 hours for attendance at trial (some time entries also reflect performance of other work such as researching discrete issues [8/8/07, 8/17/07 entries] or conferring with client [8/9/07] or drafting

a subpoena [8/15/07 entry]. Again, the plaintiff fails to delineate how much time was expended on the various tasks. Again, the factual and legal issues in this case did not warrant having multiple attorneys present at trial. Of the 40.25 hours recorded by Odojewski, the Court reduces this amount by 25 hours.

In civil rights cases where lengthy fee applications are submitted, judges are not expected to rule on the reasonableness of each entry. Walker v. Coughlin, 909 F.Supp 872, 881 (W.D.N.Y. 1995). As occurred in Real Estate Investors Asoc., except for a few entries noted above which are facially questionable, the Court considers the number of hours worked on a categorical basis to determine if a percentage reduction is warranted. A review of the remaining time entries reflects that a percentage reduction is warranted. For example, the entry on 9/14/00 records 10.25 hours for travel to Albany and examination of Joan Ripp. The amount of travel time, which is typically charged at 50% of the normal billing rate, is not delineated. The same is true for the 4/15/01 Seeger entry. Other entries appear duplicative without explanation. Seeger recorded 4.25 hours on 5/6/01 for the preparation of James Smith; Odojewski recorded 8.25 hours on 5/7/01 for the examination of James Smith. Then, on 9/28/01 and 10/1/01 Seeger recorded more hours for the preparation (2.75 hours) and examination (3.5 hours) of James Smith. Further, other entries appear to be excessive for the service performed (i.e. the 8/11/00 entry of .75 hours to "review and file affidavits of service"). Finally, some entries lack any detail as to the substance of work performed (for examples, entries on 4/14/02 and 5/25/02 record time (4.5 hours and 3.25 hours) for "meeting with client" without any explanation of the purpose of the meeting. The Court has determined that the remaining number of hours in the fee application shall be reduced by 5%.

The application states fees for 356.6 hours expended by Seeger. The Court has identified 32 hours of specific reductions, as discussed above. The remaining 324.6 hours is reduced by 5%, leaving 308.37 hours at $240 per hour for a total of $74,008.80. The applications sets out 295.7 hours attributed to work performed by Odojewski. Of that number, the Court has identified 30 hours of specific facially insufficient entries. The remaining 265.7 hours is reduced by 5%, leaving 252.22 hours at $135 per hour, or $34,049.70. The plaintiff also seeks 42.2 hours for time spent by Lam. Reduced by 5%, this amounts to 40.09 hours at $85 per hour, or $3407.65. The Court awards fees in the amount of $111, 466.15.

The plaintiff also seeks $10,213.52 in disbursements. The defendant objects to the travel costs (amounting to approximately $740.00) for two trips to Albany. The Court finds this expenditure to be reasonable. The Court awards disbursements in the amount of $10,213.52. The total amount of fees and disbursements awarded is $121,679.67.

So Ordered.

*/s/ Hugh B. Scott*
United States Magistrate Judge
Western District of New York

Buffalo, New York
May 8, 2008